# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MARGARET MCCLAIN HARE,
Individually and as Personal
Representative of the Estate of
FRANCIS X. MCCLAIN, Deceased,

       Plaintiff,

vs.                                                                              No. CIV 14-1003 JB/CG

BOARD OF COUNTY COMMISSIONERS
OF LEA COUNTY, AND POLITICAL
SUBDIVISION OF THE STATE OF NEW
MEXICO; LEA COUNTY SHERRIF'S [sic]
DEPARTMENT, A POLITICAL
SUBDIVISION OF THE STATE OF NEW
MEXICO; DEPUTY REX FLEETWOOD
IN HIS PERSONAL AND OFFICIAL
CAPACITY AS A DEPUTY OF LEA
COUNTY; AND MARK HARGROVE,
SHERIFF, IN HIS PERSONAL AND
OFFICIAL CAPACITY,

       Defendants.

*consolidated with*

DORA PANDO, as Personal Representative
for Leon Sanchez,

       Plaintiff,

vs.                                                                              No. CIV 14-1017 JB/CG

LEA COUNTY SHERIFF'S
DEPARTMENT, MARK HARGROVE,
in His [sic] personal and official
capacity as Undersheriff of Lea County,
and REX FLEETWOOD, in his personal
and Official [sic] capacity as a Deputy of
Lea County,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment, filed September 23, 2015 (Doc. 37)("MSJ").  The Court held a hearing on November 6, 2015.  The primary issues are: (i) whether Plaintiffs Margaret McClain Hare and Dora Pando ("the Plaintiffs") have successfully alleged a substantive due-process claim; (ii) whether the Plaintiffs have successfully alleged a failure-to-train-or-supervise claim against Defendants Lea County, New Mexico; Lea County Sheriff's Department ("LCSD"); and Lea County Undersheriff Mark Hargrove; and (iii) whether qualified immunity shields the Defendants from liability for their failure to prevent the murders of Leon Sanchez and Francis McClain ("the victims").   First, the Plaintiffs fail to allege substantive due-process claims against the Defendants, because they do not qualify for the danger creation exception to the general rule that defendants are not responsible for others' misconduct.   Second, the Plaintiffs cannot recover under their failure-to-train-or-supervise claim because there is no underlying constitutional violation.   Third, even if a constitutional violation occurred, the Defendants are entitled to qualified immunity because there was no clearly established duty for officers to respond to crimes or to conduct investigations consistently with the Plaintiffs' suggestions.   Accordingly, the Court grants the MSJ and enters summary judgment in favor of the Defendants.

## FACTUAL BACKGROUND

The Court takes its facts from: (i) the Plaintiffs' Consolidated Response to Defendants' Motion for Summary Judgment, filed October 16, 2015 (Doc. 41)("Response"); (ii) the First Amended Complaint for Damages, filed June 16, 2015 (Doc. 31)("Hare Complaint"); and (iii)

the First Amended Complaint for Damages, filed June 22, 2015 (Doc. 33)("Pando Complaint").

The Court adopts, for purposes of this motion only, the facts most favorable to the Plaintiffs.[1]

---

[1]Rule 56(a) of the Federal Rules of Civil Procedure requires courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The MSJ does not contain any statement of material facts.  Rule 56(e) addresses this situation:

> **(e) Failing to Properly Support or Address a Fact.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> **(1)** give an opportunity to properly support or address the fact;
>
> **(2)** consider the fact undisputed for purposes of the motion;
>
> **(3)** grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it; or
>
> **(4)** issue any other appropriate order.

Fed. R. Civ. P. 56(e) (emphasis in original).  The Court adopts the facts most favorable to the Plaintiffs, but declines to treat the MSJ as a motion for failure to state a claim under rule 12(b)(6); it will look at the exhibits.  In any case, its decision makes no difference to the disposition.  Moreover, the Court notes that the Defendants consented to this approach during its November 6, 2015 hearing:

> THE COURT: In your motion there really wasn't sort of a statement of the undisputed facts here.  Am I supposed to use the plaintiffs' additional facts? What facts do I use to determine whether, what the facts were in this case[?]
>
> MS. GLASSER: Well, it's interesting, Your Honor -- and I realize the dilemma when the motion was first drafted I was thinking about it in terms of the inadequacies of the pleadings, and it sort of evolved as I was drafting and so but to answer the courts question, the plaintiffs have converted this in effect to a summary judgment motion.  And I don't have a particular concern about the Court using the statements of the plaintiff in their response brief in terms of the facts but I would strongly urge the Court to just refer to the exhibits that they attached and in particular Exhibit 3 which clearly shows what happened in this investigation, the officer's response, and I know that they're going to say he should have gotten there faster.
>
> . . . .

Leon Sanchez resided at 1408 East Seely Road in Lovington, New Mexico.  See Hare Complaint ¶ 10, at 3; Pando Complaint ¶ 9, at 3.  His house was located in an "urban interface area" that the LCSD patrolled.  It was also less than five miles from the LCSD's main office.  See Hare Complaint ¶ 9, at 3; Pando Complaint ¶ 9, at 3.  Sanchez contracted with ADT for a security system at his home to "ensure a prompt response by the LCSD in the event he was a victim of either a burglary or an attack."  Hare Complaint ¶ 10, at 3; Pando Complaint ¶ 10, at 3 (using identical language).

On November 9, 2011 at 1:59 p.m., ADT home security unsuccessfully attempted to contact Sanchez by telephone.  See Response ¶ 4, at 5.  At 2:05:34 p.m., the ADT alarm system alerted to a possible unauthorized entry while Sanchez was at home with his friend, Francis McClain.  See Hare Complaint ¶ 11, at 3; Pando Complaint ¶ 11, at 3.  According to Lea County Deputy Rex Fleetwood's report, a "Burglary [i]n Progress was reported to the LCSO at 14:05."  Response ¶ 5, at 5.  The alarm system alerted repeatedly, which "indicated an ongoing situation."  Pando Complaint ¶ 12, at 3.  See Hare Complaint ¶ 12, at 3.  ADT contacted the Lea County Communication Authority dispatch, which directs information on alerts to the LCSD, at 2:07:06 p.m.  See Hare Complaint ¶ 13, at 3; Pando Complaint ¶ 13, at 3.

---

THE COURT:        So it sounds like [you're] comfortable with me, I mean, what the plaintiffs are primarily relying on for their additional facts which are about the only facts I have is the complaint.  I mean you're basically saying, Judge, take their version of events.  It still doesn't make a federal claim is that about what you're saying.

MS. GLASSER:        Well, for purposes of the motion . . . [although] I would strongly dispute any argument that there [were] obvious signs of a crime in progress.

Transcript of Hearing at 15:11-18:17 (Court, Glasser)(taken November 6, 2013)("Tr.")(the Court's citations to the transcript for this hearing refer to the court reporter's original, unedited version; any final version may contain slightly different page and/or line numbers).  See id. at 20:5-21:7 (Court, Newell)(accepting this approach).

At the time, Hargrove was on duty supervising the LCSD's operations.  Fleetwood was on patrol "in and around the area of Tatum, New Mexico approximately 20 miles from the Sanchez home."   Hare Complaint ¶ 15, at 4; Pando Complaint ¶ 15, at 4 (using identical language).  Fifty-six seconds after receiving notice from ADT, the LCSD dispatched Fleetwood to the Sanchez property "as a priority one dispatch for a possible home invasion and burglary." Hare Complaint ¶ 16, at 3-4; Pando Complaint ¶ 16 (using identical language).  The LCSD did not dispatch any other units.  See Hare Complaint ¶ 16, at 3-4; Pando Complaint ¶ 16 at 4.  The LCSD's policies directed that Fleetwood respond, despite that the residence was less than five miles from the LCSD's main office, and other deputies or the Lovington Police Department could have responded more promptly.  See Pando Complaint ¶ 17, at 4.  Fleetwood "did not advise dispatch or the Lea County Sheriff's Department that it would take him over twenty (20) minutes, for him to arrive and Lea County Sheriff's Department or Dispatcher should send a Deputy who was closer to the call."  Hare Complaint ¶ 18, at 4.

Four individuals went to Sanchez' residence intending to commit robbery.  See Response ¶ 3, at 5.  At 2:20:50 p.m., these individuals abducted Sanchez and McClain from the Sanchez residence, and escorted them to a white Chevrolet Corsica.  See Pando Complaint ¶ 20, at 4; Response ¶ 6, at 5; Case Report: Summary at 7, dated April 18, 2012, filed October 16, 2015 (Doc. 41-1)("Case Report").  This abduction occurred roughly sixteen minutes after ADT's call to the LCSD and thirteen minutes after the LCSD dispatched Fleetwood.  See Pando Complaint ¶ 20, at 4.  Unknown third parties later beat and murdered Sanchez and McClain "only a few miles from the Sanchez residence."  Pando Complaint ¶ 33, at 6.

Fleetwood failed to choose the most efficient route to the residence, and arrived at the wrong residence at 2:22:17 p.m., only two minutes after Sanchez and McClain's abduction.  See

Pando Complaint ¶¶ 21-22, at 4-5.  Fleetwood finally arrived at the Sanchez residence at 2:34:26 p.m., more than twenty-five minutes after ADT's call to the LCSD.  See Hare Complaint at 19.[2]

Fleetwood found the door open, two half-eaten meals in the kitchen, Sanchez' cellular telephone on the floor, "and other evidence that suggested a possible abduction."  Hare Complaint ¶ 21, at 4; Pando Complaint ¶ 27, at 5 (using identical language).  He nonetheless, without an adequate and thorough investigation, and ignoring this evidence, cleared the call without incident to the LCSD.  See Hare Complaint ¶ 21, at 4; Pando Complaint ¶ 28, at 5.  He cleared the call consistently with his training, or lack thereof, from the LCSD.  See Hare Complaint ¶ 21, at 4; Pando Complaint ¶ 28, at 5.  He secured the residence and left the scene, without attempting to obtain any evidence, alerting anyone to the possible abduction, or ascertaining the resident's whereabouts.  See Hare Complaint ¶¶ 23-24, at 4; Pando Complaint ¶¶ 30-32, at 6.  These failures were consistent with Fleetwood's training.  See Hare Complaint ¶ 29, at 5; Pando Complaint ¶ 28, at 5.  Fleetwood also failed to obtain possible evidence from Sanchez' neighbors, which included a video recording system that captured the abduction.  See Response at 10-11; Case Report at 7.

The number of burglaries in Lea County increased over thirty percent between 2004 and 2013.  See Hare Complaint ¶ 30, at 5; Pando Complaint ¶ 37, at 7.  The burglary rate is over fifty percent higher than the national average, and the burglary clearance rate is 1.19%, which is well below the national average.  See Hare Complaint ¶ 30, at 5; Pando Complaint ¶¶ 37-38, 41 at 7.  The LCSD "knew that a burglary clearance rate of 1.19% encourages rather than deters such

---

[2]The Pando Complaint instead refers to Fleetwood's report, stating that he arrived at the residence at "approximately 14:29."  Pando Complaint ¶ 23, at 5.  Although the difference in timing makes no difference to the Court's result, it adopts the later time because it is more favorable to the Plaintiffs.

crimes," but failed to improve its officers' training, assignments, or employment.   Hare Complaint ¶ 36, at 6.

The LCSD's Alarm Policy was to "provide [the] maximum safety possible for deputies and citizens during . . . robbery, bank and liquor establishment alarms."  Response ¶ 7, at 6.  It stated that responses to "residential intrusion alarms will be made any time the alarm sounds and will be handled as a burglary in progress."  Response ¶ 7, at 6.  There were no other policy provisions on how to handle or investigate a residential burglary in process call.  See Response ¶ 7, at 6.

"The New Mexico County Insurance Authority ('NMCIA') provides a 'Sheriff's Department Standard Operating Procedures Manual' containing a more stringent policy."  Hare Complaint ¶ 37, at 6.  The LCSD and Hargrove, who were responsible for training their officers and implementing new policies, deliberately chose to continue using an ineffective policy when a more effective policy was easily and readily available to them.  See Hare Complaint ¶ 38, at 6.  They also failed to adequately train or deploy Fleetwood and their other officers.  See Hare Complaint ¶ 41, at 7; Pando Complaint ¶ 48, at 8.

## PROCEDURAL BACKGROUND

Hare commenced this action in federal court on November 5, 2014.  See Complaint for Civil Rights Damages, filed November 5, 2014 (Doc. 1)("Original Complaint").  Hare asserted three claims: (i) a wrongful death claim, citing both §§ 4-41-2, 29-1-1 of the N.M.S.A. and the Fourteenth Amendment to the Constitution of the United States of America, see Original Complaint ¶¶ 23-27, at 5; (ii) a substantive due-process claim, also citing the Fourteenth Amendment, see Original Complaint ¶¶ 28-32 at 6-7; and (iii) a "deliberate indifference in supervision" claim, citing both the federal and state constitutions, Original Complaint ¶¶ 33-37,

at 7-8.  On February 3, 2015, the Honorable C. LeRoy Hansen, Senior United States District Judge for the District of New Mexico, consolidated Hare's case with Dora Pando's case, <u>Pando v. Lea County Sheriff's Department et. al.</u>, No. CIV 14-1017 JB/CG.   <u>See</u> Order for Consolidation, filed February 3, 2015 (Doc. 13)(filed in <u>Hare v. Bd. Of Cnty. Comm'rs of Lea Cnty.</u>, No. CIV 14-1003 JB/CG); Stipulated Order for Consolidation, filed February 3, 2015 (Doc. 14)(filed in <u>Pando v. Lea Cnty. Sheriff's Dep't et al.</u>, No. CIV 14-1017 JB/CG).

On March 30, 2015, the Defendants moved to dismiss the Plaintiffs' state tort claims on statute of limitations grounds.  <u>See</u> Motion to Dismiss State Tort Claims, filed March 30, 2015 (Doc. 18)("MTD").  The MTD explains that the Plaintiffs' state tort claims are subject to the New Mexico Tort Claims Act, N.M.S.A. §§ 41-4-1 to -29, including its two-year statute of limitations at § 41-4-5.  <u>See</u> MTD at 2.  It points out that Sanchez and McClain's bodies were discovered on November 9, 2011, and that the Plaintiffs did not file suit until November 2014. <u>See</u> MTD ¶¶ 5-6, at 3.  The Plaintiffs agreed to drop these claims, and the Court dismissed them on April 30, 2015.  <u>See</u> Stipulated Order Dismissing State Tort Claims, filed April 30, 2015 (Doc. 22).  The Court granted the Plaintiffs' subsequent unopposed motions to amend their complaints.  <u>See</u> Order Granting Motion to Amend, filed June 16, 2015 (Doc. 28); Order Granting Motion to Amend, filed June 16, 2015 (Doc. 30).

Both Plaintiffs amended their complaints between June 16, 2015 and June 22, 2015.  <u>See</u> Hare Complaint at 1; Pando Complaint at 1.  The Hare Complaint asserts three claims: (i) a "wrongful death for failure to protect" claim against Fleetwood, citing N.M.S.A. § 4-41-2 and § 4-41-9 and the victims' "civil rights"; (ii) a failure-to-protect-and-train claim against Hargrove, citing N.M.S.A. § 4-41-5 and the victims' "civil rights"; and (iii) a failure to-train claim against the LCSD, citing N.M.S.A. § 4-41-2 and victims' "civil rights."  Hare Complaint ¶¶ 43-86, at 7-

12.   The Pando Complaint includes the same three claims, cites the same statutes, and uses almost identical wording.  See Pando Complaint ¶¶ 51-93, at 9-14.

      1.     **The Motion for Summary Judgment.**

The Defendants filed the MSJ on September 23, 2015.  See MSJ at 1.  The Defendants make four primary arguments: (i) that the Hare and Pando Complaints merely reassert the Plaintiffs' expired state tort claims without asserting any federal civil rights claims; (ii) that, even if the allegations set forth federal civil rights claims, qualified immunity shields the Defendants from liability; and (iii) that Lea County, the LCSD, and Hargrove cannot be liable regardless whether Fleetwood violated the victims' rights.

First, the Defendants attack the new Complaints' failure to even mention federal civil rights claims.  They note that, "[d]espite being afforded an opportunity to file amended pleadings, both plaintiffs reassert the same counts of alleged negligent conduct . . . .  Indeed, plaintiffs even cite the same state statutes cited in their initial pleadings in reference to the duties owed by defendants."  MSJ at 3.  They dismiss the minor differences in the new Complaints: "[N]otwithstanding the use of 'buzz words' related to civil rights claims, the claims continue to sound solely in negligence."  MSJ at 3.  Because the Court has already dismissed the state tort claims, the Defendants argue, it should simply dismiss the case entirely.  See MSJ at 2-3.

Second, the Defendants present a qualified immunity defense.  They argue that, to even reach the question whether they have qualified immunity, "a court must first ascertain whether the plaintiff has sufficiently asserted the violation of a constitutional right at all."  MSJ at 4 (citing Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir. 1994)).  The victims' constitutional rights, the Defendants say, must be sufficiently clear that a reasonable official in the defendant's position would understand that what he or she was doing violated them.  See MSJ at 4-5.

The Defendants contend that the Plaintiffs "completely fail to even plead any particularized civil right of either decedent that was violated by any of the defendants."  MSJ at 5.  They note that there is no federal civil right "to have a certain number of officers assigned to a patrol area" or for the police to respond and investigate crimes in any particular way.  MSJ at 5.  At most, the Defendants assert, the Plaintiffs allege a federal civil right to law enforcement protection.  See MSJ at 5.  Even then, however, "the manner by which law enforcement is dispatched, responds and investigates potential crimes [is] clearly within the discretionary functions of law enforcement."  MSJ at 5.

Third, the Defendants argue that Lea County, the LCSD, and Hargrove are not liable under any possible theory.  They note that a "municipality cannot be held liable for the acts of its officers if the officer did not violate the rights of or cause harm to the plaintiff," even under Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978)("Monell").  MSJ at 5 (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)).  They say that the same principle extends to Hargrove.  See MSJ at 6 (citing Hinton v. City of Elwood, 997 F.2d 774, 783 (10th Cir. 1993)).  Even assuming a federal constitutional violation occurred, the Defendants say, the Plaintiffs cannot satisfy the requirements for liability under Monell, because there was no custom or policy that led to a constitutional violation, and the training provided did not amount to deliberate indifference.  See MSJ at 6.

**2.    The Response.**

The Plaintiffs responded on October 16, 2015.  They first argue that the MSJ fails to comply with rule 56 of the Federal Rules of Civil Procedure, because it omits any statement of undisputed material facts.  See Response at 2.  The Plaintiffs argue that this omission is sufficient to bar summary judgment.  See Response at 2.  They note that some courts have converted

motions for summary judgment unsupported by any material facts into motions under rules 12(b)(6) or (c).  See Response at 3 (citing McGee v. Schmidt, 411 F. Supp. 43, 44 (W.D. Wis. 1976)(Doyle, J.); 27A FED. PROC. L. ED. § 62.584).  The Plaintiffs suggest that the Court "not only consider the facts as pled under a Rule 12(b)(6) standard, but [] also take into account additional facts which have been developed through the discover/disclosure process which provide elements beyond what is merely contained in the pleadings and which would be available under Rule 56."  Response at 4.  The Plaintiffs thus present their own statement of facts in opposition to the MSJ.[3]

Second, the Plaintiffs attempt to provide the specific citations allegedly absent from the Hare and Pando Complaints.  See Response at 7-8.  They cite to the Hare and Pando Complaints' jurisdictional statements, which contain references to "42 U.S.C. § 1983 and the Fourth and Fourth [sic][4] Amendments of the Constitution of the United States."  Response at 8.  They then provide their theory of causation.  They cite to Martinez v. Carson 697 F.3d 1252, 1255 (10th Cir 2012), and Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006), for the proposition that "[t]he requisite causal connection is satisfied if the defendants set in motion a series of events the defendants knew or reasonably should have known would cause others to deprive the plaintiffs of their constitutional rights."  Response at 8.  They explain that the relevant test is whether non-supervisory defendants "knew or reasonably should have known that their conduct would lead to the deprivation of constitutional rights by others, and an unforeseeable intervening act has not

---

[3]The Court accepts the Plaintiffs' well-pled facts and includes them in its factual background above.  It will thus not describe them in detail again here.

[4]The Court assumes that the second mention of the "Fourth" Amendment was a typographical error, and that the Plaintiffs meant to refer to the Fourteenth Amendment.  The Hare and Pando Complaints both refer to the Fourteenth Amendment in their "Jurisdictional Allegations and Parties" sections.  Hare Complaint ¶ 1, at 2; Pando Complaint ¶ 1, at 2 (using identical language)

terminated their liability."   Response at 8-9 (citing <u>Saenz v. Lovington Mun. Sch. Dist.</u>, No. CIV 14-1005 JB/SMV, 2015 WL 2226021, at *14 (D.N.M. Apr. 30, 2015)(Browning, J.)).   The Plaintiffs then add that the intervening forces here, "kidnaping after a home invasion burglary," were foreseeable and within the scope of the original risk.  Response at 9.

Third, the Plaintiffs move to avoid the general rule that defendants cannot be held liable for third parties' actions.   <u>See</u> Response at 9 (stating the rule as a "general matter").   The Plaintiffs argue that an exception applies if, as here, "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence."  Response at 9 (quoting <u>Robbins v. Okla.</u>, 519 F.3d 1242, 1251 (10th Cir. 2008)(describing the "danger creation" theory)). The Plaintiffs then argue that their case meets the United States Court of Appeals for the Tenth Circuit's six-part danger creation test, which requires them to show that

> (1) the state entity and individual actors created the danger or increased the plaintiff's vulnerability to the danger; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious and known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, shocks the conscience.

Response at 10.   First, according to the Plaintiffs, the Defendants increased the victims' vulnerability to home invasion by their delayed and inadequate response to a burglary in progress.  <u>See</u> Response at 10.  The Plaintiffs argue that, once on the scene, Fleetwood ignored numerous signs of a crime and evidence that could have allowed a police alert for a white Chevrolet Corsica.  <u>See</u> Response at 10.  Second, the Plaintiffs contend that the victims "were members of a class of individuals who believed they were going to be protected by an ADT alarm system which was designed to promptly notify law enforcement."  Response at 10.  Third, the Plaintiffs assert that Fleetwood's poor response time put the victims at substantial risk of injury.  They say that Fleetwood's failure to investigate or locate the video cut off the victims'

chance of survival.  See Response at 10.  Fourth, the Plaintiffs note that the risks of home invasion are known, and kidnaping and murder resulting from these events "are subject to frequent stories in newspapers, on the internet and are even the subject of countless Hollywood portraits."  Response at 11.  Fifth, the Plaintiffs argue that Fleetwood acted recklessly by closing the matter without even viewing the surveillance footage.  See Response at 11.  Finally, the Plaintiffs state that these facts "shock the conscious [sic]" because of the "complete and utter indifference to the safety of anyone in the residence where the alarm was triggered."  Response at 10-11 (citing Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)).

Fourth, the Plaintiffs argue that qualified immunity does not bar any of their claims.  See Response at 12-13.  The Plaintiffs assert that they must show that "Fleetwood's actions (1) violated their rights and (2) the right was clearly established at the time of the misconduct." Response at 12 (citing Riggins v. Goodman 572 F.3d 1101, 1107 (10th Cir. 2009)).  The Plaintiffs argue that "at the very least there exists a disputed issue of material fact that the decedents' rights were violated which satisfies the first part of the test."  Response at 12.  They add that "Tenth Circuit precedent put officials on fair notice if there [sic] actions created a danger to the Plaintiff they would be violating substantive due process rights."  Response at 12-13.

Fifth, the Plaintiffs argue that the municipality was deliberately indifferent to its inhabitants.  See Response at 13.  They note that the municipality had "no training and no policy for what to do when responding to a 'burglary in progress.'"  Response at 13.  They add that there was no guidance "on what to do when an empty house is encountered with an unlocked door, a half eaten meal and a home owner who cannot be reached."  Response at 13.

3.      **The Reply**.

The Defendants replied on October 29, 2015.  See Defendants' Reply in Support of Motion for Summary Judgment, filed October 29, 2015 (Doc. 42)("Reply").  First, the Defendants attack the Plaintiffs' attempt to state federal civil rights violations, noting that "neither Amended Complaint actually sets forth any count containing any alleged civil right violation."  Reply at 2.  They point out that the Fourth Amendment claim seems insubstantial, because no one acting under color of any law subjected the Plaintiffs to an unlawful search or seizure.  See Reply at 2.

Second, the Defendants attack the Plaintiffs' use of Trask v. Franco and Martinez v. Carson.  See Reply at 2.  They note that those cases involved only law enforcement figures, public entities, and public employees acting under color of state law.  The Plaintiffs' case, of course, involved kidnapping and murder by third parties.  See Reply at 2.

Third, the Defendants emphasize the general rule that "the state has no affirmative obligation under the Due Process Clause to protect 'the interests of life, liberty, and property of its citizens against invasion by private actors.'"  Reply at 3 (quoting Deshaney v. Winnebago Cnty. Dep't of Social Servs., 489 U.S. 189, 195 (1989)("Deshaney")).

Fourth, the Defendants attempt to rebut the Plaintiffs' arguments on each prong of the danger-creation-exception test.  See Reply at 4-7.  They explain that "any response to the alarm by defendants did not and could not have increased vulnerability to a home invasion that had already occurred."  Reply at 4.  They contend that Fleetwood did not ignore the risk of kidnaping, as he met with a family member, found no signs of forced entry/stolen property, and attempted to contact Sanchez and sent an officer to his place of business.  See Reply at 5.  They also state that ADT customers are not a specialized and definable group of individuals

particularly vulnerable to crime or entitled to police protection.  See Reply at 5.  They note that

the Plaintiffs offer no alternative "appropriate" response that would have changed the course of

events, and that, even assuming that there was a better response, none of the Defendants acted

with the requisite state of mind -- "reckless and with a conscious disregard of the supposed

known risk."  Reply at 6.  The Defendants contend that there was no knowledge of any abduction

and that even Sanchez' brother and next-door neighbor did not realize that anything so terrible

had occurred.  See Reply at 5.

The Defendants state that courts look to three factors to determine whether conduct

shocks the conscience: "(1) the need for restraint in defining the scope of substantive due process

claims; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to

local policymaking bodies in making decisions impacting public safety."   Reply at 6 (citing

Uhlrig v. Harder, 64 F.3d at 573.  They allow that the deaths here were tragic, but argue that their

ordinary negligence is not sufficient to shock the judicial conscience.  See Reply at 7.

Finally, the Defendants argue that qualified immunity applies, because they could not

possibly have known that they would violate anyone's due-process rights through their actions

and response to the events at the Sanchez residence.  See Reply at 8.

### 4. **The Hearing.**

The Court held a hearing on the MSJ on November 6, 2015.  See Tr. at 1.  The

Defendants largely repeated their earlier arguments, but they took care to note that the Plaintiffs

failed to raise their danger-creation-exception theory until their Response.  See Tr. at 4:19-5:1

(Glasser).  They noted that ADT system alerts "happen[] quite frequently, and should not alert an

officer that somebody is in immediate danger."  Tr. at 11:1-4 (Glasser).  They add that the

surveillance video merely shows people walking out of the house rather than a kidnapping.  See

Tr. at 11: 16-21 (Glasser).  They conclude that "[t]his is not an officer who stopped on his way to buy donuts and coffee and stopped at home and switched out his laundry, and kind of fiddlefaddled around until he happened to get there and completely ignored blood spatter and drag marks in the yard."  Tr. at 17: 3-8 (Glasser).  The Court pointed out, however, that given the Defendants' concessions about the facts, it had to assume that the police could have prevented the crime if they had arrived in a reasonable manner.  See Tr. at 16:19-25 (Court).

The Plaintiffs acknowledged that there was no general right to be "free from violence from third parties," but continued to maintain that state actors increased their vulnerability.  Tr. at 21:24-22:4 (Newell).  The Plaintiffs clarified, in response to a question from the Court, that they had only "this one federal substantive due process claim left" and that they had abandoned their state claims.  Tr. at 28:3-9 (Newell)(quoting the Plaintiffs as admitting that, "irrespective of the state of the pleadings, I believe that in looking at this, we've not asserted any other issues in our response").  The Plaintiffs noted that, if the Court began to weigh the case report's account against the pleadings, it would be deciding disputed issues of material fact.  See Tr. at 29:7-17 (Newell).  They attempted to name the cases that best support their qualified immunity arguments.  Although they allowed that it was "not necessarily close factually," they cited Medina v. City & County of Denver, 960 F.2d 1493 (10th Cir. 1992), for the proposition that "if you're reckless you can be responsible for the[] actions of third parties."  Tr. at 33:6-13 (Newell).  The Plaintiffs conceded that they would have no training claim if they did not have a substantive due-process claim.  See Tr. at 38:1-11 (Court, Newell).

The Court explained that it was skeptical of the Plaintiffs' theory, noting that

when I write out the facts in a favorable way to the plaintiff it's still going to be a negligence case and it's not going to be one that's going to shock the conscience, and even if I could get there, I think that it's going to fall on clearly established.

Tr. at 39:7-18 (Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting) (emphasis in original).[5]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts

---

[5]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot

decide any issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's

version of the facts. This doctrine developed most robustly in the qualified immunity arena. In

Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that

summary judgment was appropriate where video evidence "quite clearly contradicted" the

plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most
> favorable to the nonmoving party only if there is a "genuine" dispute as to those
> facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving
> party has carried its burden under Rule 56(c), its opponent must do more than
> simply show that there is some metaphysical doubt as to the material facts . . . .
> Where the record taken as a whole could not lead a rational trier of fact to find for
> the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec.
> Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote
> omitted). "[T]he mere existence of *some* alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no *genuine* issue of *material* fact."
> Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing
> parties tell two different stories, one of which is blatantly contradicted by the
> record, so that no reasonable jury could believe it, a court should not adopt that
> version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent
> was driving in such fashion as to endanger human life. Respondent's version of
> events is so utterly discredited by the record that no reasonable jury could have
> believed him. The Court of Appeals should not have relied on such visible
> fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the
> litigation, a plaintiff's version of the facts must find support in the record: more
> specifically, "[a]s with any motion for summary judgment, when opposing parties
> tell two different stories, one of which is blatantly contradicted by the record, so

- 20 -

> that no reasonable jury could believe it, a court should not adopt that version of
> the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)
> (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v.
> Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312 (brackets omitted).  "The Tenth Circuit, in Rhoads

v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[6] explained that the

blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"   Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)

(Browning, J.)(citation omitted) aff'd, 499 F. App'x 771 (10th Cir. 2012).

> In evaluating a motion for summary judgment based on qualified immunity, we
> take the facts "in the light most favorable to the party asserting the injury." Scott
> v. Harris, 550 U.S. 372, 377 (2007).   "[T]his usually means adopting . . . the
> plaintiff's version of the facts," id. at 378, unless that version "is so utterly
> discredited by the record that no reasonable jury could have believed him," id.
> at 380.   In Scott, the plaintiff's testimony was discredited by a videotape that
> completely contradicted his version of the events.  550 U.S. at 379.  Here, there is
> no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'
> testimony. There is only other witnesses' testimony to oppose his version of the
> facts, and our judicial system leaves credibility determinations to the jury. And
> given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory
> problems go to the weight of his testimony, not its admissibility . . . . Mr. Rhoads
> alleges that his injuries resulted from a beating rendered without resistance or
> provocation. If believed by the jury, the events he describes are sufficient to

---

   [6]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R.
32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive
value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court
finds that Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009) and Lobozzo v. Colorado
Department of Corrections, 429 F. App'x 707 (10th Cir. 2011) have persuasive value with
respect to material issues, and will assist the Court in its preparation of this Memorandum
Opinion and Order.

support a claim of violation of clearly established law under <u>Graham v. Connor</u>,
490 U.S. 386, 395-96 (1989), and this court's precedent.

<u>Rhoads v. Miller</u>, 352 F. App'x at 291-92 (internal quotation marks omitted).  <u>See</u> <u>Lymon v.</u>
<u>Aramark Corp.</u>, 728 F. Supp. 2d at 1249-50 (quoting <u>Rhoads v. Miller</u>, 352 F. App'x at 291-92).

In a concurring opinion in <u>Thomson v. Salt Lake County</u>, the Honorable Jerome A. Holmes,
United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal
question of qualified immunity and "determine whether plaintiff's factual allegations are
sufficiently grounded in the record such that they may permissibly comprise the universe of facts
that will serve as the foundation for answering the legal question before the court," before
inquiring into whether there are genuine issues of material fact for resolution by the jury.
584 F.3d at 1326-27 (Holmes, J., concurring)(citing <u>Goddard v. Urrea</u>, 847 F.2d 765, 770 (11th
Cir. 1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes
are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the
plaintiffs' facts").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia, subjects,
> or causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress, except that in
> any action brought against a judicial officer for an act or omission taken in such
> officer's judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was unavailable.  For the
> purposes of this section, any Act of Congress applicable exclusively to the
> District of Columbia shall be considered to be a statute of the District of
> Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d at 1255 ("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d at 1046.  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is inapplicable to Bivens[7] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell, 436 U.S. at 689).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

---

[7]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

1.      <u>Color of State Law</u>.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."  <u>Jojola v. Chavez</u>, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  <u>West v. Atkins</u>, 487 U.S. at 49 (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  <u>Jojola v. Chavez</u>, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  <u>Gallagher v. Neil Young Freedom Concert</u>, 49 F.3d at 1447 (quoting <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"  <u>Jojola v. Chavez</u>, 55 F.3d at 493 (quoting <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. at 935-36 n.18; <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a

public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted) (quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    Individual Liability.

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d at 1046.  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell, 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.  The recovery should be guided by

common-law tort principles -- including principles of causation . . . ."   <u>Train v. City of Albuquerque</u>, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.   <u>Lippoldt v. Cole</u>, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."   <u>Bodine v. Warwick</u>, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."   72 F.3d at 400.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  <u>See</u>, <u>e.g.</u>, <u>Warner v. Orange Cnty. Dep't of Prob.</u>, 115 F.3d 1068, 1071 (2d Cir. 1997); <u>Springer v. Seaman</u>, 821 F.2d 871, 877 (1st Cir. 1987), <u>abrogated on other grounds by</u> <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701 (1989).

<u>Trask v. Franco</u>, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."   <u>Martinez v. Carson</u>, 697 F.3d at 1255.   The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.  The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused

> to the suspect on the theory that the illegal entry without knocking and
> announcing rendered any subsequent use of force unlawful?  The obvious answer
> is "no."  The suspect's conduct would constitute a "superseding" cause, see
> Restatement (Second) of Torts § 442 (1965), that would limit the officer's
> liability.  See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."  Trask v. Franco, 446 F.3d at 1047 (quoting WILLIAM

LLOYD PROSSER ET AL., PROSSER AND KEETON ON TORTS § 44, at 303-04 (5th ed.1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his
> antecedent wrongful act, and under the undisputed facts there is room for
> reasonable difference of opinion as to whether such act was wrongful or
> foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing RESTATEMENT (SECOND) OF TORTS § 453 cmt. b

(1965)).

## LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . .

deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend.

XIV, § 1.  In general, state actors may be held liable under § 1983 only for their own affirmative

acts that violate a plaintiff's due-process rights and not for third parties' acts.  See Robbins v.

Okla., 519 F.3d at 1251 (citing DeShaney, 489 U.S. 189, 197 (1989)).  "[N]othing in the

language of the Due Process Clause itself requires the State to protect the life, liberty and

property of its citizens against invasion by private actors."  DeShaney, 489 U.S. at 195.  The Due

Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney, 489

U.S. at 195.  "As a general matter, . . . a state's failure to protect an individual against private

violence simply does not constitute a violation of the Due Process Clause."  DeShaney, 489 U.S.

at 197.  See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1125 (10th

Cir. 2008)).  Generally, negligence does not trigger the Due Process Clause's protections.  See

Davidson v. Cannon, 474 U.S. 344, 348 (1986).

### 1.     Exceptions to the General Rule.

There are, however, two exceptions to this general rule.  First, the special-relationship

doctrine arises when the state has a custodial relationship with the victim, which triggers an

affirmative duty to provide protection to that individual.  See Christianson v. City of Tulsa, 332

F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-995

(10th Cir. 1994).  Second, the danger creation theory provides that a state may also be liable for

an individual's safety "only when 'a state actor affirmatively acts to create, or increases a

plaintiff's vulnerability to, or danger from private violence.'"  Robbins v. Okla., 519 F.3d at

1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)).

### 2.     Special-Relationship Doctrine.

The first exception to the general principle that a state's negligent failure to protect an

individual cannot trigger liability under the Due Process Clause is the special-relationship

doctrine.  A plaintiff must show involuntary restraint by the government to establish a duty to

protect under the special-relationship doctrine.  See Liebson v. N.M. Corr. Dep't, 73 F.3d 274,

276 (10th Cir. 1996).  "A special relationship exists when the state assumes control over an

individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g.

when the individual is a prisoner or involuntarily committed mental patient)."  Uhlrig v. Harder,

64 F.3d at 572.  A pretrial detention is one such relationship.  See Lopez v. LeMaster, 172 F.3d

756, 759 n.2 (10th Cir. 1999)("Pretrial detainees are protected under the Due Process Clause . .

."). This doctrine imposes upon prison officials the responsibility to take "reasonable measures to insure the safety of the [detainees]." Lopez v. LeMaster, 172 F.3d at 759.

Prison officials violate a detainee's due-process rights when their "acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs." Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006)(quoting Estelle v. Gamble, 429 U.S. 87, 106 (1976)). To show that a prison official's acts or omissions evidence this deliberate indifference, courts perform a two-part inquiry, composed of a subjective and an objective component: "Under the objective inquiry, the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension. In addition, under the subjective inquiry, the prison official must have a 'sufficiently culpable state of mind'" Self v. Crum, 439 F.3d at 1230-1231 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). A defendant has the requisite culpable state of mind under the subjective inquiry only where the defendant's conduct evidences conscious disregard of a substantial risk of harm.

> A prison official cannot be liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

Self v. Crum, 439 F.3d at 1231 (quoting Farmer v. Brennan, 511 U.S. at 837).

### 3. **Danger Creation Exception.**

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger creation exception to this rule applies only when "a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d at 923. Under a danger creation theory, there will be no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v.

Harder, 64 F.3d at 573.    To state a prima-facie case, the plaintiff must show that his or her danger creation theory for due-process violations meets a six-part test:   (i) the state and individual actors must have created the danger or increased plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a member of a limited and specifically definable group; (iii) the defendant's conduct must put the plaintiff at substantial risk of serious, immediate, and proximate harm; (iv) the risk must be obvious and known; (v) and the defendant must have acted recklessly in conscious disregard of that risk.   See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d at 1126.

The Tenth Circuit has focused on the deliberateness of the conduct in relation to the caused harm.   See Christiansen v. City of Tulsa, 332 F.3d 1270, 1281 (10th Cir. 2003).   The defendant must recognize the unreasonableness of the risk of the conduct and act "with an intent to place a person unreasonably at risk."   Medina v. City & Cnty. of Denver, 960 F.2d at 1496. The intent to place a person unreasonably at risk is present where the defendant "is aware of a known or obvious risk" creating a high probability that serious harm will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard of the consequences."   Medina v. City & Cnty. of Denver, 960 F.2d at 1496.

**4.        What Shocks the Conscience.**

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.   See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").   "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government

power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006))(internal quotation marks omitted).   "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d at 574)(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge."  Pena v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates.  See 265 F.3d at 1132.  The district court found that the plaintiff failed to state a § 1983

claim for violation of the Due Process Clause under a danger-creation theory because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience."   265 F.3d at 1134.   The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due-process rights when they did not take sufficient action to prevent a student at the school from "racking"[8] the plaintiffs' son.  716 F. Supp. 2d at 1072-73.  The Court concluded that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75.  The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate.  Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.
>
> While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .
>
> Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.  Even if the Defendants knew that students

_____

[8]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2 (citations omitted) (internal quotation marks omitted).

frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." Butz v. Economou, 438 U.S. 478, 504 (1978). "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts." Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905.

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. at 232 (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs" and operates to protect officers from the law's sometimes "hazy border." Saucier v. Katz, 533 U.S. 194, 206 (2001). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d at 1107.

### 1.    Procedural Approach to Qualified Immunity.

In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, the protocol that Saucier v. Katz authorized -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan, 555 U.S. at 241. In rejecting the

- 34 -

prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established

and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."   Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42)(internal quotation marks omitted).[9]  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged

---

[9]As former-Tenth Circuit judge, and now Stanford Law School professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions.  See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).  This practice is good for the nation's judicial system to achieve uniformity in a nation of 319 million people.  See, e.g., Michigan v. Long, 463 U.S. 1032, 1040 (1983)(stating that "there is an important need for uniformity in federal law").  But see Amanda Frost, Overvaluing Uniformity, 94 Va. L. Rev. 1567 (2008)(criticizing courts' focus on uniformity of the law).  If a district court in New Mexico is trying -- as it does diligently and faithfully -- to receive and read its superior courts' unwritten signals, it would appear that Justice Alito in Pearson v. Callahan and Judge Gorsuch in Kerns v. Bader are trying to suggest that district courts should, whenever possible, decide qualified immunity on the clearly established prong.  For example, Justice Alito and Judge Gorsuch gave seven situations when the Court should decide a case solely on the clearly established element and not "avoid avoidance."  Kerns v. Bader, 663 F.3d at 1180-81.  Even the phrase "avoid avoidance" suggests that the district court is to generally avoid, not decide, the constitutional issue.  The clearly established prong has clearly become the qualified immunity tail that is wagging the constitutional civil rights violation dog.  Rather than doing the hard work of constitutional analysis, judges are encouraged to take the lazy approach by deciding that the right -- whatever it is -- is not clearly established.

The Court is concerned about this push to not decide constitutional issues, for a number of reasons.  The Court set forth some of these concerns in Kerns v. Board of Education.  Additionally, there is a practical problem.  Sometimes, for a district court to really know whether a right is clearly established, it has to do the first analysis, and thoroughly explore whether there is a right and whether it has been violated.  If it jumps to the mushy, hazy area of clearly established without knowing what the right is, the analysis lacks any precision.  While appellate courts may think that jumping to the clearly established prong saves district courts a lot of trouble, in the Court's experience, the old rule -- in Saucier v. Katz -- made more sense and, practically, is the way the Court still has to go in many cases.

conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity

context.  Camreta v. Greene, 131 S. Ct. at 2031-2.  See Kerns v. Bader, 663 F.3d at 1181.[10]

---

[10]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . .  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

> 407 U.S. at 238-39 (modifications in original).  Congress did not say it would remedy only violations of "clearly established" law, but that

>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

thereof to <u>the deprivation of any rights, privileges, or immunities</u> <u>secured by the Constitution and laws</u>, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in <u>Pierson v. Ray</u>, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  <u>See</u> E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: <u>Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases</u>, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975).  In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, <u>The Fourth Amendment at a Three-Way</u> <u>Stop</u>, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  <u>See</u> Christopher Slobogin, <u>Why Liberals Should Chuck the Exclusionary Rule</u>, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, <u>Constitutional</u> <u>Alternatives to the Exclusionary Rule</u>, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In <u>Hudson v. Michigan</u>, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).  See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones."[11]).  The

_____

alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers II, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations).

[11]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the

litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not self-defining and disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff.  The three most recent qualified immunity cases the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.  See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565.  The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

Tenth Circuit will remand a case to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

> **2.** **Clearly Established Rights in the Qualified Immunity Analysis.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. at 640.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A

court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d at 1298.

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 131 S. Ct. at 2084. The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" on the application of law to facts and operates to protect officers from the law's sometimes "hazy border." Saucier v. Katz, 533 U.S. at 206.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference." 663 F.3d at 1188 (emphasis in original). In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in

- 42 -

our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked

legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying

the level of generality at which a legal rule must be defined, applied a sliding scale to determine

when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d at 1284 ("The

more obviously egregious the conduct in light of prevailing constitutional principles, the less

specificity is required from prior case law to clearly establish the violation.").  "[W]hen an

officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second

decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509

F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving

fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. at 741.

   In Rivera v. Bates, No. CIV 12-0473 JB/RHS, 2014 WL 3421050 (D.N.M. June 21,

2014)(Browning, J.), the Court used the Kerns v. Bader qualified-immunity framework to

determine if it was clearly established that arresting a suspect in his underwear and failing to

retrieve his clothing to cover him while transporting him from his house to a patrol car makes the

arrest unreasonable.  See 2014 WL 3421050, at *54.  The Court stated:

> Even if the Court could, on the record before it, conclude, as a matter of law, that
> the manner in which Hernandez effectuated the arrest was [un]reasonable, the
> Court finds that the law was not clearly established such that a reasonable officer
> in Hernandez' position would have recognized that he needed to retrieve clothing
> for S. Rivera rather than escort him directly to the police vehicle.  As the Tenth
> Circuit has emphasized, although "a case on point isn't required if the impropriety
> of the defendant's conduct is clear from existing case law," the law is not clearly
> established where "a distinction *might* make a constitutional difference."  Kerns v.
> Bader, 663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with
> the search of a home, the Tenth Circuit explained that the relevant question
> "wasn't whether we all have some general privacy interest in our home," but
> "whether it was *beyond debate* in 2005 that the officers' entry and search lacked
> legal justification."  663 F.3d at 1183 (emphasis added).  Here, S. Rivera has
> relied on Cortez v. McCauley to establish that his clearly established rights were
> violated, but the Tenth Circuit in that case stated that it had "little difficulty
> concluding that a small amount of force, like grabbing Rick Cortez and placing

him in the patrol car, is permissible in effecting an arrest under the Fourth Amendment."  663 F.3d at 1128.  The Tenth Circuit only made one comment regarding Cortez' clothing during the arrest:

> Although the dignity aspects of this arrest are troubling, specifically hauling Rick Cortez (clad only in his shorts) into the patrol car in the middle of the night without any explanation, the police were investigating a serious felony and claimed a need for quick action to separate the accused from any other children that might be in the home.

478 F.3d at 1128-29.  The Tenth Circuit did not explain what would have to be different about the "dignity aspects" for the arrest to violate the Fourth Amendment.  More importantly, the Court emphasizes that Hernandez did not participate in any of the alleged wrongdoing inside S. Rivera's house, nor did he refuse to allow S. Rivera to get dressed; instead, Hernandez was involved in the arrest only after S. Rivera was outside the house.  S. Rivera has not pointed to, nor has the Court been able to identify, any cases that demand that an officer delay taking the arrestee to a police vehicle so the officer can enter the arrestee's home to search for clothing or otherwise find some covering for an arrestee on the way to the police vehicle.  The Court will thus grant the MSJ on S. Rivera's excessive and unreasonable force claim against Hernandez.

Rivera v. Bates, 2014 WL 3421050, at *54 (emphasis in original).

## ANALYSIS

The Court will grant the MSJ.  The Court will dismiss the Plaintiffs' substantive due-process claims, because they fail to allege or otherwise show that the Defendants' affirmative conduct created a danger or that they qualify for the danger creation exception.   The Court will also dismiss the Plaintiffs' failure-to-train or failure-to-supervise claim, because a failure-to-train-or-supervise claim requires an underlying constitutional violation.   Additionally, because the Defendants did not violate any clearly established constitutional rights, they are entitled to qualified immunity.  Because the Court has already disposed of the Plaintiffs' state claims,[12] it will dismiss this matter with prejudice.

---

[12]The Plaintiffs agreed to a stipulated order dismissing their original state tort claims. See Stipulated Order Dismissing State Tort Claims, filed April 30, 2015 (Doc. 22).  The Hare

## I.   THE PLAINTIFFS FAIL TO ALLEGE A VALID SUBSTANTIVE DUE-PROCESS CLAIM.

The Plaintiffs fail to allege valid substantive due-process claims against Fleetwood or the other Defendants.   Their underlying substantive due-process claim is based on the danger creation theory.   See Response at 12-13; Tr. at 6:21-24 (Court, Glasser)(noting that only one federal claim remains); Tr. at 19:7-13 (Court, Newell)(establishing that the Plaintiffs seek to establish that the danger creation exception applies).   This theory, however, has numerous problems when applied in this case.

The Tenth Circuit requires a plaintiff to show six factors to establish a danger creation theory.

> When a plaintiff alleges a danger was created by the defendant, the plaintiff must demonstrate that 1) plaintiff was a member of a limited and specifically definable group; 2) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; 3) the risk was obvious or known; 4) defendant acted recklessly in conscious disregard of that risk; 5) such conduct when viewed in total, is conscience shocking; and 6) defendant created the danger or increased the plaintiff's vulnerability to the danger in some way.

Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 920 (alterations omitted)(quoting DeAnzona v. City and Cnty. of Denver, 222 F.3d 1229, 1235 (10th Cir. 2000)).   "There are also two preconditions that the plaintiff must show: that the state actor engaged in affirmative conduct and that there was private violence." Estate of B.I.C. v. Gillen, 761 F.3d 1099, 1105 (10th Cir. 2014) (internal quotation marks omitted).   Here, the Plaintiffs do not allege or otherwise show one of the preconditions -- that the Defendants' affirmative conduct created the danger.   Moreover, they

---

and Pando Complaints cite, however, to state statutes and appear to re-assert the same state tort claims.   See Hare Complaint ¶¶ 43-86, at 7-12; Pando Complaint ¶¶ 51-93, at 9-14.   The Plaintiffs do not, however, re-assert these claims.   See Tr. at 28:3-9 (Newell)("[I]rrespective of the state of the pleadings, I believe that in looking at this, we've not asserted any other issues in our response.").   Even if the Plaintiffs did re-assert the same state law claims, the Court would dismiss them again on statute-of-limitations grounds.   See MTD ¶¶ 5-6, at 3; Stipulated Order Dismissing State Tort Claims, filed April 30, 2015 (Doc. 22).

do not allege or otherwise show that the victims were members of a limited and specifically definable group, and that the Defendants' conduct shocks the conscience.

### A. THE PLAINTIFFS DO NOT ALLEGE OR OTHERWISE SHOW AFFIRMATIVE CONDUCT ON THE DEFENDANTS' PART.

The Plaintiffs do not allege or otherwise show affirmative conduct on the Defendants' part. The danger creation theory requires them to show that the Defendants engaged in affirmative conduct that created the danger or made the victims more vulnerable to the danger. See Estate of B.I.C. v. Gillen, 761 F.3d at 1105; Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 925 ("As we have seen, 'affirmative conduct' is a necessary precondition to such application." (quoting Graham v. Indep. Sch. Dist. No. I-89, 22 F.3d at 995)). The Supreme Court has explained:

> In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

DeShaney, 489 U.S. at 200. "'[F]oreseeability cannot create an affirmative duty to protect when plaintiff remains unable to allege a custodial relationship.'" Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 916 (quoting Graham v. Indep. Sch. Dist. No. I-89, 22 F.3d at 994). "'[I]naction by the state in the face of a known danger is not enough to trigger the obligation'" to protect a plaintiff from a third party's harm. Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 916 (quoting Graham v. Indep. Sch. Dist. No. I-89, 22 F.3d at 995). Thus, even if the Defendants "were aware of the risk, expressly promised to eliminate the risk, and failed to do so," there is no constitutional violation unless they affirmatively created the danger that harmed the victims. Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d at 925.

Here, the Plaintiffs cannot allege that the Defendants affirmatively acted to create the danger that caused the victims' death, as the four unknown assailants were responsible for that result.  They instead argue that Fleetwood and the other Defendants affirmatively acted to "increase[] a plaintiff's vulnerability to[] danger from private violence" by ignoring numerous signs of a crime in progress.  Currier v. Doran, 242 F.3d at 923.  Even accepting all of the Plaintiffs' allegations, however, the Plaintiffs allege only that the Defendants' negligence increased the risk of harm to the victims.  They note that Fleetwood failed to choose the most efficient route, arrived at the wrong address, failed to obtain any evidence, and did not ascertain Sanchez' whereabouts.  See Pando Complaint ¶¶ 27-28, at 5; Hare Complaint ¶ 21, at 4.  The Tenth Circuit requires that a defendant's affirmative conduct create the danger; negligence or inaction does not constitute affirmative conduct.  See Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1173 (10th Cir. 2013)("There is, however, a question as to whether there is sufficiently affirmative conduct on the part of the state in placing the plaintiff in danger.  Our precedents consistently conclude that mere negligence or inaction is not enough."  (citation omitted)(internal quotation marks omitted)).  See also DeShaney, 489 U.S. at 201 ("That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all.").

Courts have rejected similar allegations that police officers failed to adequately investigate dangerous situations.  In Hernandez v. City of Goshen, Indiana, 324 F.3d 535 (7th Cir. 2003), the plaintiff alleged that a workplace manager called the police about a credible threat from an employee with access to guns.  See 324 F.3d at 539.  The United States Court of Appeals for the Seventh Circuit held that the police department's failure to investigate the threat

did not violate any duty to the plaintiffs.  See 324 F.3d at 538.  The Seventh Circuit also concluded that a police officer who failed to investigate a possible sexual relationship between a middle school teacher and her student for over two months "plainly" took no affirmative action and thus could not be held liable.  Windle v. City of Marion, Ind., 321 F.3d 658, 661 (7th Cir. 2003).  The Plaintiffs allege that the Defendants' failure to take various steps -- their negligence rather than any affirmative conduct -- increased the victims' risk.  Accordingly, they do not establish a danger creation claim.

### B.    THE VICTIMS WERE NOT MEMBERS OF A LIMITED AND SPECIFICALLY DEFINABLE GROUP.

The Plaintiffs do not allege or otherwise show that the victims were members of a limited and specifically definable group.  They argue that they were "members of a class of individuals who believed they were going to be protected by an ADT alarm system which was designed to promptly notify law enforcement in the event of a home invasion burglary."  Response at 10. The Tenth Circuit has recognized at least the possibility that "limited and specifically defined groups" could include mental health therapists placed at risk by a mental hospital's decision to transfer violent criminals into the general hospital population.  See Uhlrig v. Harder, 64 F.3d at 574.  District courts have recognized a definable group as wide as students at Columbine High School in Columbine, Colorado during the 1999 shootings.  See Castaldo v. Stone, 192 F. Supp. 2d 1124, 1172 (D. Colo. 2001)(Babcock, J.); Ireland v. Jefferson Cnty. Sheriff's Dep't, 193 F. Supp. 2d 1201, 1219 (D. Colo. 2002)(Babcock, J.).  There is nothing, however, about ADT customers that make them particularly vulnerable to the harms in this case.  If anything, the presence of an ADT system would make them less vulnerable.

**C.    THE   DEFENDANTS'   CONDUCT   DOES   NOT   SHOCK   THE
CONSCIENCE.**

The Defendants' conduct does not shock the conscience.  "Whether the conduct shocks
the conscience is an objective test, based on the circumstances, rather than a subjective test based
on the government actor's knowledge."  Pena v. Greffet, 922 F. Supp. 2d at 1227.  The Tenth
Circuit considers three factors in determining if a defendant's conduct shocks the conscience:
"(1) the need for restraint in defining the scope of substantive due process claims; (2) the concern
that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies
in making decisions impacting public safety."  Ruiz v. McDonnell, 299 F.3d 1173, 1184 (10th
Cir. 2002).  This determination is limited to exceptional circumstances, which do not include
ordinary negligence.  See DeAnzona v. City & Cnty. of Denver, 222 F.3d at 1236 ("However,
mere negligence does not shock the conscience.").

Here, the Defendants' conduct in responding slowly and inadequately, and failing to
investigate the burglary, does not shock the Court's conscience.  The Plaintiffs argue that "[t]he
public expects a report of a crime in progress to elicit an immediate and appropriate response,
not a dispatch of a deputy in another town," but this charge merely speaks to the Defendants'
possible negligence.  Response at 11.  The Court has considered other cases with more
unfortunate facts and concluded that they did not shock its conscience.  In Schaefer v. Las
Cruces Public School District, the Court held that the defendant school officials' conduct did not
shock the conscience when they failed to take steps to protect a student from being racked by
other students, even though the defendants (i) were aware of other racking incidents; (ii) knew
that the racking could be considered sexual assault; and (iii) identified the student as a racking
victim.  See 716 F. Supp. 2d at 1075.  The Court noted:

> The Tenth Circuit has stated, however, that the "shocks the conscience" standard requires "a high level of outrageousness," <u>Camuglia v. the City of Albuquerque</u>, 448 F.3d at 1223, requiring something more than negligent, reckless, or even intentional conduct, [s]ee <u>id.</u> at 1222. "[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." <u>Uhlrig v. Harder</u>, 64 F.3d at 574.

<u>Schaefer v. Las Cruces Pub. Sch. Dist.</u>, 716 F. Supp. 2d at 1075. There, the Court found that, even though the defendants were aware of prior incidents, their conduct was not sufficiently outrageous to meet the shocks-the-conscience standard. <u>See</u> 716 F. Supp. at 1075. The Defendants' actions here are also far less extreme than the facts in <u>James v. Chavez</u>, where a police officer used deadly force against a suspect who, subjectively, may not have had intent to harm police officers. <u>See</u> 830 F. Supp. 2d at 1276. Unlike the Defendants here, the defendants in <u>Martinez v. Uphoff</u> deliberately failed to ensure proper training and supervision of prison personnel. <u>See</u> 265 F.3d at 1132. Other prisoners later killed the plaintiff's husband during an escape attempt. <u>See</u> 265 F.3d at 1132. The Tenth Circuit affirmed the district court's conclusion that the defendants' "inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard." 265 F.3d at 1135. The risks here were far less obvious. The Court acknowledges that the victims' fate was tragic, but the Defendants' failure to properly respond to an alarm system's alert is not so outrageous that it shocks the conscience.

## II.  THE PLAINTIFFS DO NOT ADEQUATELY ALLEGE OR OTHERWISE SHOW A FAILURE-TO-TRAIN-OR-SUPERVISE CAUSE OF ACTION.

The Plaintiffs do not sufficiently allege or otherwise show a failure-to-train-or-supervise cause of action because there is no underlying constitutional violation. As the Court has previously held, the Defendants did not violate the victims' federal constitutional rights. The Plaintiffs have not adequately alleged that the Defendants' affirmative conduct increased the risk

to the victims, or that the victims were members of a limited and specifically defined group.  The

Defendants' conduct does not shock the conscience.

> A municipal entity's liability requires an underlying constitutional violation.
>
> Without a constitutional violation, the municipal liability claim fails.  See Jiron v. City of Lakewood, 392 F.3d 410, 419 n.8 (10th Cir. 2004)("[W]hen a finding of qualified immunity is based on a conclusion that the officer has committed no constitutional violation -- i.e., the first step of the qualified immunity analysis -- a finding of qualified immunity does preclude the imposition of municipal liability.")(emphasis in original); Sanchez v. City of Albuquerque, No. CIV 12-1161 JB/KBM, 2014 WL 1953499, at *17 (D.N.M. Apr. 30, 2014) (Browning, J.)("Because Sanchez has failed to establish that a municipal employee, specifically an Albuquerque police officer, violated his constitutional rights, his municipal liability claim must fail."); Chavez v. Cnty. of Bernalillo, No. CIV 13-0309 JB/LFG, 3 F. Supp. 3d 936, 948 (D.N.M. 2014) (Browning, J.)("Without a constitutional violation, the Court concludes that Chavez cannot maintain a municipal liability claim."); Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745 (D.N.M. Dec. 8, 2011) (Browning, J.)("[B]ecause Garcia failed to prove an underlying constitutional violation by Casaus, the City of Rio Rancho is entitled to summary judgment on Garcia's municipal liability."); Lovelace v. Cnty. of Lincoln, No. CIV 10-0763 JB/WPL, 2011 WL 2731179, at *14 n.6 (D.N.M. June 30, 2011)(Browning, J.)("Without an underlying constitutional violation, no municipal liability exists.").

J.H. ex rel. J.P. v. Nation, No. CIV 12-0128 JB/LAM, 2015 WL 403596, at *33 (D.N.M. Jan. 19,

2015)(Browning, J.).  Similarly, a failure-to-train or failure-to-supervise claim requires an

underlying constitutional violation.

> Since the plaintiff has failed to state a constitutional claim at all, her claims against the other defendants for supervisory liability and for failure to train fail. See City of Canton v. Harris, 489 U.S. 378, 391 . . . (1989)(The city's constitutional liability for failure to train or for inadequately training its employees is premised on there being an underlying constitutional violation of the harmed individual's rights.); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581-82 (1st Cir. 1994)(To establish supervisory liability, the plaintiff must show an underlying constitutional violation.).

Rivera v. Rhode Island, 402 F.3d 27, 38-39 (1st Cir. 2005).  The Court has already concluded

that there was no underlying constitutional violation.  The Plaintiffs have admitted that they do

not have training or supervision claims if they lack an underlying substantive due-process claim. See Tr. at 38:1-11 (Court, Newell).  Their failure-to-train-and-supervise claim must fail.

## III.    **THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

The Defendants are entitled to qualified immunity.  To overcome qualified immunity, the Plaintiffs must show: (i) that the Defendants' actions violated her constitutional or statutory rights; and (ii) that the rights were clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d at 1107.  The Court has already concluded that the Defendants did not violate any constitutional rights.  Accordingly, the Plaintiffs do not satisfy the first prong, and the Defendants are entitled to qualified immunity.

The Plaintiffs also do not satisfy the second prong.  The Tenth Circuit has stated that, "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  The Plaintiffs state that existing cases "put officials on fair notice if there [sic] actions created a danger to the Plaintiff they would be violating substantive due process rights."  Response at 12-13.  This definition of the relevant right is overly general, and the Plaintiffs' cited cases do not support their claim.  See Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)("We have repeatedly told courts . . . not to define clearly established law at a high level of generality.")(quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2084 (2011)).  At the hearing, the Court pressed Pando's counsel for the closest parallel cases.  See Tr. at 32:9-14 (Court).  Pando's counsel identified Medina v. City & Cnty. of Denver, 960 F.2d at 1498, and DeShaney, 489 U.S. at 201.  Medina v. City & Cnty. of Denver, however, granted summary judgment for police officers who began a high-speed chase, leading the suspect to injure a bicyclist.  See 960 F.2d at 1498.  DeShaney involved an

unsuccessful attempt to hold a state liable for failing to protect a child from his father after receiving reports of possible abuse. See 489 U.S. at 201. The Court then pressed Hare's counsel for his most similar cases. See Tr. at 35:15-19 (Court). Hare's counsel pointed to an unnamed case, for which he did not have the citation, in which an "officer did not have his flashers on at an intersection and caused a death." Tr. at 35:20-25. None of these cases indicate that the law was so clearly established that the Defendants would know that what they were doing -- or not doing -- would violate federal constitutional law.

The Plaintiffs' other cited cases are similarly distinguishable. Johnson ex rel. Estate of Cano v. Holmes cited the danger creation theory in a footnote, but the case involved a state agency's failure to prevent adoptive parents from killing a child. See 455 F.3d at 1145. Rost ex rel. K.C. v. Steamboat Springs RE-2 School District rejected a claim that a school created a danger of sexual harassment on the grounds that it "sound[ed] in negligence, not deliberate misconduct." 511 F.3d at 1126. Given the Tenth Circuit's holding in Kerns v. Bader -- although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference" -- these cases do not support the Plaintiffs' arguments. 663 F.3d at 1188 (emphasis in original). The Plaintiffs do not point to cases in which police arrived late to a crime scene and did not witness a crime, or cases finding that an investigation was constitutionally inadequate. Something factually closer is necessary for the law to be clearly established. Because there is no case on point that would have alerted the Defendants that their conduct was unconstitutional and violated the Due Process Clause, the law was not clearly established at the time of the accident. Consequently, the Defendants are entitled to qualified immunity.

**IT IS ORDERED** that: (i) Defendant's Motion for Summary Judgment, filed October 16, 2015 (Doc. 37), is granted in its entirety; and (ii) all claims against Defendants Board of County Commissioners of Lea County, Lea County Sheriff's Department, Deputy Rex Fleetwood, and Undersheriff Mark Hargrove are dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Max Houston Proctor
Hobbs, New Mexico

-- and --

Dick A. Blenden
Blenden Law Firm, P.A.
Carlsbad, New Mexico

     *Attorneys for Plaintiff Margaret McClain Hare*

Michael T. Newell
Newell Law Firm, LLC
Lovington, New Mexico

     *Attorney for Plaintiff Dora Pando*

Amy L. Glasser
Potts & Associates
Albuquerque, New Mexico

     *Attorney for the Defendants*

- 54 -